**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LORENZO BUDET, *on behalf of himself and all others similarly situated*, <br><br> Plaintiff, <br><br> v. <br><br> RUTGERS BUSINESS SCHOOL, *et al.*, <br><br> Defendants. | Civil Action No. 22-02134 (GC) (JBD) <br><br> **OPINION** |

**CASTNER, District Judge**

This matter comes before the Court upon Defendants Rutgers Business School ("RBS") and Rutgers, the State University of New Jersey's Motion to Dismiss Plaintiff's First Amended Class-Action Complaint ("Amended Complaint"), pursuant to Federal Rules of Civil Procedure ("Rules") 12(b)(1) and 12(b)(6).  (ECF No. 15.)  Plaintiff Lorenzo Budet opposed (ECF No. 16), and Defendants replied (ECF No. 19).  The Court has carefully considered the parties' submissions and decides the motion without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b).  For the reasons set forth below, and other good cause shown, Defendants' motion is **GRANTED**.

I.   **BACKGROUND**[1]

    A.   **FACTUAL BACKGROUND**

In September 2019, Plaintiff began a part-time Supply Chain Management MBA program at Rutgers University. (ECF No. 13 ¶ 6.) At the time Plaintiff filed his Amended Complaint (the operative complaint), he was still a graduate student enrolled in the program. (*Id.*) Plaintiff has paid out of pocket for his tuition, fees, and related expenses. (*Id.*)

RBS, one of the constituent schools of Rutgers, is "the second largest school at . . . Rutgers, serving thousands of students." (ECF No. 11 ¶ 1; ECF No. 13 ¶ 7.) Rutgers claims that the program in which Plaintiff is enrolled is a top-ten MBA program for Supply Chain Management in the world. (ECF No. 13 ¶ 6.)

        1.   U.S. NEWS & WORLD REPORT EMPLOYMENT DATA REPORTING AND STANDARDS

Like other business schools, RBS sends data on its recent graduates' employment to U.S. News & World Report, which uses the data to rank the "Best Graduate Schools." (*Id.* ¶¶ 27-31.) These rankings are based on two types of data: (1) expert opinions about program excellence and (2) statistical indicators that measure the quality of a school's faculty, research, and students. (*Id.* ¶ 31.) The statistical indicators are further split into two categories for purposes of ranking MBA programs: (1) inputs, or measures of the qualities that students and faculty bring to the educational experience; and (2) outputs, or measures of graduates' achievements linked to their degrees. (*Id.* ¶ 34.) In measuring an MBA program's outputs, U.S. News considers starting salaries and MBA graduates' ability to find jobs upon graduation or within three months of graduation. (*Id.* ¶¶ 34-

---

[1]   When considering this motion to dismiss, the Court accepts all factual allegations in the Complaint as true. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

35.) Plaintiff's claims against Defendants arise from Defendants' allegedly fraudulent reporting of RBS's output data. (*Id.* ¶¶ 21, 34, 35.)

In late 2021 and early 2022, U.S. News surveyed the 493 accredited[2] institutions with master's level business programs in the United States. (*Id.* ¶ 36.) The schools reported on their "full-time campus-based and hybrid programs." (*Id.* ¶ 37.) Ultimately, U.S. News ranked 134 business schools that provided data on their full-time MBA programs. (*Id.* ¶ 40.) In ranking these schools, U.S. News gives significant weight to "placement success," which is a statistic comprised of three ranking indicators on employment and earnings. (*Id.* ¶ 41.) In total, "placement success" statistics contribute to 35% of each business school's U.S. News overall ranking. (*Id.*)

In defining how MBA programs should report employment statistics so that U.S. News can assess placement success, U.S. News uses the MBA Career Services & Employer Alliance, or "CSEA," Standards for Reporting Employment Statistics. (*Id.* ¶ 42.) The CSEA Standards define how MBA programs should report full-time MBA employment statistics and other career information, including starting base salaries; signing bonuses; and as relevant here, what proportion of MBA graduates have jobs at graduation or within three months of graduation. (*Id.*)[3] The CSEA Standards instruct, for example, that a "job offer is a valid offer for a specific position" and that the offer should be for "MBA-level work." (*Id.* ¶ 46 (emphasis omitted).) The CSEA

---

[2] The business schools that U.S. News surveyed are accredited by AACSB International, an organization that Plaintiff avers is "widely considered the gold standard of business school accreditation." (ECF No. 13 ¶ 36.)

[3] In this allegation, Plaintiff emphasizes that these standards apply to reporting of full-time MBA programs but makes no averment as to reporting of part-time programs. (*See* ECF No. 13 ¶ 42.) Accompanying this allegation is a link to a page of the CSEA website titled "Standards for Reporting Employment Statistics." STANDARDS FOR REPORTING EMPLOYMENT STATISTICS, http://mbacsea.org/standards (last visited Apr. 12, 2022). The page provides different standards for reporting "Full-time MBA," "Part-time MBA," and "Specialty Masters" employment statistics. (*Id.*)

Standards also establish that employment data should not include "positions accepted later than three months post-graduation" and "salary information for graduates who were company-sponsored or already employed, i.e., who had not accepted a new employment offer." (*Id.* ¶ 49.)

The stated purpose of the CSEA Standards is to provide an "accepted reporting standard for MBA employment data." (*See id.* ¶ 43.) Rutgers is a member of the MBA CSEA. (*Id.*)

### 2. DEFENDANTS' ALLEGED SCHEME TO DECEIVE

In 2018, despite being subject to the CSEA Standards, Defendants hired unemployed MBA students and placed them into "token permanent positions" with the university. (*Id.* ¶ 55.) Defendants hired the MBA students via the temporary employment agency Adecco. (*Id.* ¶ 56.) In doing so, Defendants used more than $400,000.00 from the university endowment to finance the positions the MBA students filled and to issue a kickback to Adecco for hiring the students. (*Id.* ¶ 57.)

The alleged scheme began on June 5, 2018, when a meeting was scheduled between Assistant Dean Dean R. Vera and Associate Director of Communications and Marketing Dan Stoll. (*Id.* ¶¶ 60-61.) After the meeting, Vera emailed colleagues at Rutgers, including Stoll, the resumes of RBS students who had not yet secured employment. (*See id.* ¶¶ 60-61, 63.) The next day, Vera followed up on his email to Stoll:

> Attached please find a [r]esume [p]acket with candidates whom I believe may meet your hiring needs. Should you want to discuss any of these candidates, do not hesitate to contact me.

> [(*Id.* ¶ 62.)]

On June 14, 2018, Manish Kumar, a former RBS Associate Dean of Finance and Administration, sent an email to Stoll:

> Have you identified the two students? If so please let us know so that we can move [forward] with [the] temp hiring process.

> [Vera]- By what date [should the] students . . . be employed by?
>
> [(*Id.* ¶ 63 (emphasis omitted).)]

Vera responded to Kumar, copying Dean Lei Lei, the Dean of RBS:

> The 90th day after Commencement is August 16th. Students must have accepted an offer, whether verbally or in writing, on or before this date.
>
> [(*Id.* ¶¶ 64, 97.)]

Between July and August 2018, Defendants hired up to six unemployed MBA students through Adecco. (*Id.* ¶¶ 68-94.) The Adecco hires were counted as employed on August 10, 2018, though several offers were not extended to MBA students until August 20, 2018. (*Id.* ¶¶ 75, 77, 91, 107.)

On August 10, 2018, in the midst of hiring unemployed MBA graduates to positions through Adecco, Lei congratulated Vera, King, and Provost and Executive Vice Chancellor of Rutgers University-Newark Ashwani Monga for their efforts at reducing the number of MBA-graduates seeking jobs. (*Id.* ¶ 103.) Lei acknowledged that six students were hired by Adecco to "fill urgent temporary work needs at Rutgers/RBS" and that she was "not familiar with the placement data reporting process," adding:

> [I]f the temporary hiring should be disclosed to the ranking agency, please do so to avoid any misunderstanding. The reputation of RBS and our integrity are more important than anything else.
>
> [(*Id.*)]

Vera responded to Lei:

> Thank you, Lei. Regarding the Adecco hires, it is my understanding [that] these are contract positions with the potential of leading to full-time position[s]. (Please check with [Kumar]). If that is the case, the [CSEA] Standards state that we count them as employed.

[(*Id.* ¶ 104.)]

Kumar responded and confirmed that if the Adecco employees performed well, they could potentially achieve a full-time position. (*Id.* ¶ 105.)

In December 2018, RBS ranked 24th among business schools in the Americas and 1st in public business schools in the Northeastern United States. (*Id.* ¶ 96.) Rutgers posted publicly about its ranking successes, in part to induce students to attend RBS. (*Id.* ¶¶ 97-102.) Ultimately, the artificially enhanced employment statistics from 2018 enhanced RBS's rankings for the years 2018, 2019, 2020, 2021, and 2022. (*Id.* ¶ 108.)

**B.     PROCEDURAL BACKGROUND**

Plaintiff filed a Class-Action Complaint in this Court.[4] (ECF No. 1.) Defendants then moved to dismiss Plaintiff's Class-Action Complaint. (ECF No. 10.) In turn, Plaintiff filed the Amended Complaint. (ECF No. 13.) Plaintiff asserts three causes of action against Defendants, on behalf of both Plaintiff and the putative class: (1) violations of the New Jersey Consumer Fraud Act (NJCFA); (2) Breach of Contract; and (3) Unjust Enrichment. (ECF No. 13 ¶¶ 126-176.) Defendants move to dismiss all counts under Rules 12(b)(1) and 12(b)(6). (ECF No. 15-1 at 10.[5])

Because the Court resolves Defendants' motion under Rule 12(b)(1), the Court does not reach Defendants' arguments under Rule 12(b)(6). *See In re Corestates Tr. Fee Litig.*, 837 F. Supp. 104, 105 (E.D. Pa. 1993), *aff'd*, 39 F.3d 61 (3d Cir. 1994) ("When a motion under Rule 12 is based on more than one ground, the court should consider the 12(b)(1) challenge first because if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and

---

[4]     Subject-matter jurisdiction is based on 28 U.S.C. § 1332(d)(2)(A).

[5]     Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

objections become moot."); *see also* Wright & Miller, 5B Fed. Prac. & Proc. Civ. § 1350 (3d ed. Apr. 2023) ("[W]hen the motion is based on more than one ground, the cases are legion stating that the district court should consider the Rule 12(b)(1) challenge first.").

## II.   **LEGAL STANDARD**

Under Rule 12(b)(1), a court must grant a motion to dismiss if it lacks subject matter jurisdiction to hear a claim. *See* Fed. R. Civ. P. 12(b)(1). A motion to dismiss for want of standing is properly brought under Rule 12(b)(1), because "standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). On a motion to dismiss for lack of standing, plaintiff "bears the burden of establishing the elements of standing, and each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Id.* (citations and internal quotation marks omitted); *see also Transunion LLC v. Ramirez*, 141 S. Ct. 2190, 2207-08 (2021) (confirming that "plaintiffs must demonstrate standing for each claim that they press and for each form of relief they seek . . . with the manner and degree of evidence required at the successive stages of the litigation").

In evaluating a Rule 12(b)(1) motion to dismiss, courts must first determine whether the motion "presents a 'facial' attack or a 'factual' attack on the claim at issue, because that distinction determines how the pleading must be reviewed." *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014) (quoting *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012)). "A facial 12(b)(1) challenge, which attacks the complaint on its face without contesting its alleged facts, is like a 12(b)(6) motion in requiring the court to 'consider the allegations of the complaint as true.'" *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016) (citation omitted). A factual challenge, on the other hand,

7

"attacks allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts." *Id.* The party invoking the federal court's jurisdiction has "the burden of proof that jurisdiction does in fact exist." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). The Court deems Defendants' Motion as a facial attack as the Court need only consider the allegations in the Amended Complaint and the documents referenced therein for purposes of deciding the motion. *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).[6] Accordingly, the Court will consider the allegations in the Amended Complaint and the documents referenced therein in the light most favorable to Plaintiff. *Aichele*, 757 F.3d at 358.

## III. DISCUSSION

Defendants contest that Plaintiff has Article III standing to bring his claims. (ECF No. 15-1 at 10-11, 19-22.) Defendants argue that because Plaintiff is a graduate student in a part-time MBA program at RBS, not in a full-time program, he has not suffered a cognizable injury for Article III purposes. (*Id.* at 11, 20.) Defendants point out that all of Plaintiff's claims explicitly relate to RBS's alleged manipulation of data related to its full-time MBA program, and that part-time MBA programs are subject to different CSEA reporting standards. (*Id.*)

Plaintiff first counters that Defendants' standing argument is premature and should be preserved for class certification. (ECF No. 16 at 30-31.) Plaintiff then argues that even if the

---

[6]   In his opposition papers, Plaintiff provides an exhibit titled, "There is Significant Overlap Between Course Selection in the M.S. Supply Chain Management and MBA Programs." (ECF No. 16-1.) The Court, however, does not rely on the exhibit for purposes of the present motion. *Olson v. Ako*, 724 F. App'x 160, 166 (3d Cir. 2018) ("And it is 'axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.'" (quoting *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988))).

Court performed a standing analysis, Defendants' standing challenge would fail under the standard described in *Haas v. Pittsburgh Nat. Bank*.[7]  (*Id.* at 31.)

As "[s]tanding is the threshold question in every case and determines the power of the [C]ourt to entertain [a] suit," the Court must resolve whether Plaintiff has Article III standing before reaching the merits of Defendants' motion.  *Bittner v. Waterford Twp. Sch. Dist.*, Civ. No. 18-12084, 2020 WL 10223599, at *2 (D.N.J. Jan. 13, 2020) (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975)); *see also Finkelman v. Nat'l Football League*, 810 F.3d 187, 195 (3d Cir. 2016) (finding that if Article III standing cannot be established, a district court "must dismiss a putative class action for lack of subject matter jurisdiction" under Rule 12(b)(1)).

Article III of the United States Constitution "restricts judicial power to 'cases' or 'controversies.'"  *Twp. of Lyndhurst, N.J. v. Priceline.com Inc.*, 657 F.3d 148, 154 (3d Cir. 2011) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 151 (1970)).  To establish Article III standing, a plaintiff must demonstrate "(1) an injury-in-fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision."  *Finkelman*, 810 F.3d at 193.  The "injury in fact" inquiry is often determinative of standing.  *Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 205 (3d Cir. 2021) (citations omitted).  "A plaintiff seeking to establish [an] injury in fact must show that he or she suffered an invasion of a legally protected interest" that is concrete and particularized and actual or imminent, not conjectural or hypothetical."  *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)) (internal quotations omitted).  "To be 'concrete,' an injury must be 'real, or distinct and palpable, as opposed to merely abstract.'"  *Finkelman*, 810

---

[7]  526 F.2d 1083, 1088-89 (3d Cir. 1975).

F.3d at 193 (quoting *N.J. Physicians, Inc. v. President of the United States*, 653 F.3d 234, 238 (3d Cir. 2011)). "To be sufficiently 'particularized,' an injury must 'affect the plaintiff in a personal and individual way.'" *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 n.1 (1992)). A plaintiff does not allege an injury-in-fact if he relies on a "chain of contingencies" or "mere speculation." *Id.* (quoting *Aichele*, 757 F.3d at 364).

As an initial matter, the Court disagrees with Plaintiff's argument that Defendants' motion is premature because Article III standing should not be resolved until the class-certification stage. (ECF No. 16 at 30-31.) "[C]lass action representatives must meet Article III standing requirements the moment a complaint is filed," because this Court's judgments are not binding over any plaintiff lacking Article III standing. *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 367 (3d Cir. 2015) (citing *Lewis v. Casey*, 518 U.S. 343, 358 (1996)); *see also Transunion*, 141 S. Ct. at 2208 (noting in the class-action context that "[e]very class member must have Article III standing in order to recover individual damages" and that "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not"); *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 634 (3d Cir. 2017) ("[N]amed plaintiffs who represent a class must allege and show that they personally have been injured." (quoting *Lewis*, 518 U.S. at 357)); *Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194, 223 (D.N.J. 2020) (making clear that "[i]n the context of a class action, Article III must be satisfied 'by at least one named plaintiff'" (quoting *Neale*, 794 F.3d at 359)). Accordingly, the Court must consider whether a named class-plaintiff has Article III standing, no matter how early in the case the issue is raised. *Grp. Against Smog & Pollution v. Shenango Inc.*, 810 F.3d 116, 122 n.6 (3d Cir. 2016) (making clear that "an objection to subject-matter jurisdiction," such as an objection to whether a plaintiff has Article III standing, "may be raised at any time"); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94

(1998) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1868))).

Here, Defendants contest that Plaintiff has established, on the face of his Amended Complaint, that he suffered a particularized injury for purposes of Article III standing. (*See* ECF No. 15-1 at 19 (asserting that "Plaintiff lacks standing to assert claims premised on a program he does not attend").) In arguing that Plaintiff alleges he is enrolled in Rutgers's part-time MBA program, as opposed to Rutgers's full-time MBA program, Defendants suggest that none of the alleged misconduct could have affected Plaintiff in a personal and individual way. (*Id.* at 19-21.) This is because Plaintiff alleges only that Defendants falsified *full-time* MBA program employment statistics. (*Id.*; *see also* ECF No. 13 ¶¶ 27, 32, 40, 42, 45, 51, 97, 102.)

The Court agrees. On his own allegations, Plaintiff did not suffer a constitutionally sufficient particularized injury to confer Article III standing. For starters, the Amended Complaint includes no allegations suggesting that Defendants allegedly falsified part-time MBA employment data, particularly for the part-time Supply Chain Management program in which Plaintiff was enrolled. Nor does Plaintiff allege that he relied on full-time MBA data in deciding to attend Rutgers's part-time program.[8] (*See generally* ECF No. 13.) Instead, Plaintiff's allegations concern falsifications of only full-time MBA employment data. (*Id.* ¶¶ 27, 32, 40, 42, 45, 51, 97, 102.) Throughout the Amended Complaint, Plaintiff focuses on — and, indeed, emphasizes — "full-

---

[8] Even if Plaintiff did adequately allege that he relied specifically on full-time MBA employment data in deciding to attend Rutgers, the Court questions if such reliance suffices to establish a constitutional injury-in-fact where Plaintiff is not attending the full-time program and the full-time MBA-program's employment statistics would not apply to him as a graduate of the part-time MBA program.

11

time" when describing Rutgers's reporting of MBA employment statistics. (*See, e.g.*, *id.* ¶ 42.) The CSEA Standards, on which Plaintiff heavily relies, only bolster that there are separate standards for reporting employment statistics for full-time MBA programs and part-time MBA programs. (*Id.* (citing STANDARDS FOR REPORTING EMPLOYMENT STATISTICS, http://mbacsea.org/standards).)

Plaintiff tries to apply a product-liability theory to this context, asking the Court to evaluate Article III standing under the *Haas* standard, which allows plaintiffs who did not buy certain defective products to maintain constitutional standing. (ECF No. 16 at 31.) *Haas*, 526 F.2d at 1088-89.

*Haas* has been interpreted as promulgating the following standard for assessing Article III standing of plaintiffs who did not personally purchase a product:

> [A] court will consider whether a 'plaintiff [has] standing to assert claims on behalf of putative class members regarding products they did not personally purchase where (1) the basis of the claims is the same, (2) the products are closely related, and (3) the claims are against the same defendants.'
>
> [*Simner v. LG Elecs. U.S.A., Inc.*, Civ. No. 21-13322, 2022 WL 3152707, at *4 (D.N.J. Aug. 8, 2022) (citations omitted).]

But the *Haas* standard does not replace the other requirements of Article III standing. Plaintiff still must allege that he suffered a concrete and particularized injury to gain access to the *Haas* test. *See Sauer v. Subaru of Am., Inc.*, Civ. No. 18-14933, 2020 WL 1527779, at *3 (D.N.J. Mar. 31, 2020) (applying the *Haas* test but noting prior to the test's application "[i]n a class action context, the plaintiff must still 'show that [he] has personally been injured; indeed, the class plaintiff cannot rely on 'injuries suffered by other, unidentified members of the class'" (citations omitted)). This is implicit in *Haas*, where the Third Circuit Court of Appeals "held that a plaintiff could assert a claim on behalf of a class against a particular defendant even though she lacked

12

standing to assert that claim *because she had standing to assert two other closely related direct claims against the defendant.*" *In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d 451, 461 (D.N.J. 2005) (citing *Haas*, 526 F.2d at 1088-89) (emphasis added). Thus, for the *Haas* test to apply, the proposed class-plaintiff must have Article III standing to bring at least one claim against Defendants. This requires the Court here to determine first if Plaintiff has established his Article III standing to bring any claim against Defendants.

Defendants argue, and the Court agrees, that Plaintiff fails to establish Article III standing. (ECF No. 15-1 at 19-22.) Plaintiff, a graduate student in the part-time MBA program, does not allege that Rutgers falsified the part-time MBA program's employment data, nor does Plaintiff allege that he relied on the full-time data in deciding to enroll in Rutgers's part-time program. (*See generally* ECF No. 13.)[9] The closest Plaintiff comes to stating a cognizable injury is his alleging that he would not have attended RBS or paid "Defendants' premium per credit rate of tuition" but for RBS's "high rankings." (*Id.* ¶ 4.) Still, Plaintiff does not allege on which rankings (whether rankings pertaining to the full-time program or rankings pertaining to the part-time program) he relied in deciding to attend Rutgers. (*See id.* ¶ 101 (listing "applicable rankings" for RBS that include separate rankings for the full-time and part-time programs).)

Even if the Court assumed that Plaintiff relied on the full-time program's rankings in deciding to enroll in the part-time program, it would still be unclear what concrete and particularized injury Plaintiff allegedly suffered. *See Finkelman*, 810 F.3d at 193 (noting "[t]o be

---

[9] To illustrate, Plaintiff's Amended Complaint includes several allegations about "students" generally — for example, "*students* chose to attend Rutgers based on these false representations and manipulated MBA and other masters programs ranking statistics," and "*students* are heavily influenced by and rely upon Defendant Rutgers' ranking/statistics, not only when choosing one institution over another, but when making the decision to take out loans to pay for higher education in the first instance." (ECF No. 13 ¶¶ 26, 28 (emphasis added).) These allegations, of course, are not specific to Plaintiff.

13

'concrete,' an injury must be 'real, or distinct and palpable, as opposed to merely abstract,'" and "[t]o be sufficiently 'particularized,' an injury must 'affect the plaintiff in a personal and individual way'" (internal citations omitted)). The Amended Complaint makes clear that Plaintiff's harm — as presently alleged — is inextricably tied to RBS's rankings: "But for [RBS]'s high rankings . . . Plaintiff would have selected a different program. If [RBS] had not received these high rankings, Plaintiff would have not agreed to pay Defendants' premium per credit rate of tuition." (ECF No. 13 ¶ 4.) In his own words, Plaintiff's "ascertainable loss for damages" is "measured by the incremental difference the tuition and fees Rutgers actually charged to Plaintiff and the amount of tuition and fees [Plaintiff] would have paid had [he] enrolled in other unranked or lower ranked programs." (*Id.* ¶ 144.) Put simply, Plaintiff alleges that he did not receive the value of the premium that he paid for a highly ranked school. (*See id.* ¶ 143 ("Plaintiff and Class members, despite paying a premium tuition, received an education less than and different from what they expected based on Rutgers' false statistics and rankings.").)

Considering that Plaintiff has pled his injury this way — that is, tying the program's value and price strictly to its ranking — and that the allegedly false rankings remain high, it is unclear what injury Plaintiff is claiming to have suffered. (*See id.* ¶ 108 (alleging that "the data submitted in 2018, impacts the rankings for 2019, 2020, and 2021").) Indeed, according to the Amended Complaint, as of 2022, the year Plaintiff filed the Amended Complaint and four years after the allegedly fraudulent reporting, RBS remains a highly ranked business school — the rankings have stayed substantially the same. (*Id.* ¶ 101.)

These allegations, even viewed in a light most favorable to Plaintiff, sound of deception without an injury or with an injury that has not yet occurred. To the extent that Plaintiff anticipates that RBS will drop in rankings because of the allegedly fraudulent reporting, merely anticipating

14

RBS's drop in rankings does not make Plaintiff's claim ripe for judicial determination. *See Wyatt, Virgin Islands, Inc. v. Virgin Islands*, 385 F.3d 801, 806 (3d Cir. 2004) ("A dispute is not ripe for judicial determination if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (internal quotation marks and citation omitted)).[10] Indeed, a misrepresentation untethered to an injury is insufficient for establishing Article III standing or a claim under the NJCFA. *See Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 460, 464 (N.J. 1994) (requiring plaintiff asserting NJCFA claim to have suffered "ascertainable loss," "calculated within a reasonable degree of certainty," due to "unlawful practice"). Without describing a measurable diminution in the value of his degree — demonstrated by, for example, a measurable drop in Plaintiff's employability because of RBS's fraudulent reporting or a quantifiable shortfall in the quality of education that Plaintiff received — Plaintiff alleges an injury that is conjectural or hypothetical. As long as Plaintiff ties his injuries solely to RBS's rankings, and those rankings remain unchanged, Plaintiff cannot allege that he suffered a concrete and particularized injury.

Because Plaintiff has not first shown that he suffered an injury-in-fact sufficient to confer Article III standing, the Court does not reach the application of *Haas*. As a result, this Court lacks subject-matter jurisdiction over this matter. Defendants' Motion to Dismiss Plaintiff's Amended Complaint under Rule 12(b)(1) is granted. *See Finkelman*, 810 F.3d at 195 (finding that if Article III standing cannot be established, a district court "must dismiss a putative class action for lack of subject matter jurisdiction" under Rule 12(b)(1)); *see also Steel Co.*, 523 U.S. at 94 ("Without jurisdiction the court cannot proceed at all in any [case]. Jurisdiction is power to declare the law,

---

[10] "Standing and ripeness both stem from the same constitutional limit and often 'boil down to the same question.'" *Nat'l Shooting Sports Found. v. Att'y Gen. of New Jersey*, Civ. No. 23-1214, 2023 WL 5286171, at *2 (3d Cir. Aug. 17, 2023) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 n.5 (2014)).

and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." (internal quotation marks and citation omitted)).

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss Plaintiff's Amended Complaint under Rule 12(b)(1) (ECF No. 15) is **GRANTED**. Plaintiff's Amended Complaint (ECF No. 13) is **DISMISSED** without prejudice. An appropriate Order follows.

Dated: August 30, 2023

*s/ Georgette Castner*
**GEORGETTE CASTNER**
**UNITED STATES DISTRICT JUDGE**