**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| LORENZO BUDET, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>RUTGERS BUSINESS SCHOOL, et al.,<br><br>Defendants. | Civil Action No. 22-2134 (RK) (JBD)<br><br>**OPINION** |

**KIRSCH, District Judge**

This matter comes before the Court upon Defendants Rutgers Business School ("RBS") and Rutgers, the State University of New Jersey's (collectively, "Rutgers") Motion to Dismiss, (ECF No. 25), Plaintiff Lorenzo Budet's ("Budet") Second Amended Class Action Complaint ("SAC," ECF No. 23), pursuant to Federal Rules of Civil Procedure (Rules) 12(b)(1) and 12(b)(6). Budet filed an opposition brief, (ECF No. 26), to which Rutgers filed a reply brief, (ECF No. 27). The Court has carefully considered the parties' submissions and decides the motion without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, Rutgers's motion is **GRANTED**.

I. **BACKGROUND**[1]

The underlying facts of this dispute have been thoroughly discussed and set forth in the August 30, 2023 Opinion, ("Castner Op.," ECF No. 21"), of the Honorable Georgette Castner, U.S.D.J. granting Rutgers' previous Motion to Dismiss and Budet leave to file a Second Amended Complaint. To the extent relevant, the Court adopts and incorporates the factual recitation of the case in that Opinion.

### A. FACTS

The premise of this putative class action lawsuit is that students who enrolled in RBS since January 2018 paid for something they did not receive: an affiliation with a top-ranked MBA program whose ranking was based on honest reporting. (SAC ¶¶ 2-3.) Budet, a graduate of RBS's part-time MBA program, alleges that Rutgers manipulated employment data of its full-time MBA program to boost the program's rankings and increase enrollment in all programs. (SAC ¶¶ 2, 9, 11.) He alleges that in 2018, Rutgers paid Adecco, a temporary employment agency, to hire up to six unemployed MBA students and place them into "token permanent positions" with the university so that they appeared to have jobs outside the university. (SAC ¶¶ 78-80.) Budet contends industry reporting standards prohibit universities from counting internal hires toward employment statistics. (SAC ¶¶ 76, 81.) He also alleges that Rutgers counted the Adecco hires as being employed prior to the individuals officially receiving employment offers. (SAC ¶ 130.)

In this purported class action against Rutgers, Budet asserts claims for (1) violations of the New Jersey Consumer Fraud Act (NJCFA), (2) breach of contract, and (3) unjust enrichment. (SAC ¶¶ 154–210.)[2] Budet contends that he would not have enrolled in Rutgers and paid a

---

[1] When considering this motion to dismiss, the Court accepts all factual allegations in the Complaint as true. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).
[2] Subject-matter jurisdiction is based on 28 U.S.C. § 1332(d)(2)(A).

premium for its tuition but for the full-time MBA program's artificially high ranking, entitling him to a refund of that premium. (SAC ¶¶ 6, 170.)

### B. PROCEDURAL HISTORY

On April 12, 2022, Budet filed his original Complaint against Rutgers. (ECF No. 1.) In lieu of answering the Complaint, on June 27, 2022, Rutgers filed a Motion to Dismiss the Complaint. (ECF No. 10.) In response, Budet filed an Amended Complaint on July 18, 2022. (ECF No. 13.) Rutgers again moved to dismiss, arguing *inter alia*, that Budet lacked standing to sue over statistics of a program that he does not attend. (ECF No. 15.) Budet countered that a standing analysis was premature, and even so, standing exists under the "*Haas* test,"[3] which permits a plaintiff to assert a claim on behalf of a class against a defendant, even though the plaintiff lacks standing on that claim, because the plaintiff has standing on "closely related" claims against the defendant. (ECF No. 16.)

The Court agreed with Rutgers that Budet lacked Article III standing and dismissed the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1). (*See generally*, Castner Op.) First, Judge Castner concluded that the standing analysis was not premature and proceeded to determine whether Budet had standing to assert his claims in federal court. (*Id.* at 10.) Second, Judge Castner held that "Plaintiff did not suffer a constitutionally sufficient particularized injury to confer Article III standing." (*Id.* at 11.) This was due, in part, to Budet failing to claim "that Defendants allegedly falsified part-time MBA employment data, particularly for the part-time Supply Chain Management program in which [Budet] was enrolled" or that Budet "relied on full-time MBA data in deciding to attend Rutgers's part-time program." (*Id.*) In addition, Judge Castner rejected Budet's attempt to rely on *Haas*, as this "standard does not replace the other requirements

---

[3] *Haas v. Pittsburgh Nat. Bank*, 526 F.2d 1083, 1088-89 (3d Cir. 1975).

of Article III standing. [Budet] still must allege that he suffered a concrete and particularized injury to gain access to the Haas test." (*Id.* at 12.)

In discussing Plaintiff's alleged injury, the Court found that Budet alleged his "ascertainable loss for damages" was the "incremental difference" between what he paid Rutgers and what he "would have paid had [he] enrolled in other unranked or lower ranked programs." (*Id.* at 14 (quoting ECF No. 13 ¶ 144).) His theory of loss was that he "received an education less than and different from what" he expected. (Castner Op. at 14 (quoting ECF No. 13 ¶ 143).) But beyond that assertion, Budet's complaint did not mention the quality of education he received, nor did it demonstrate how the allegedly undeserved rankings devalued his education. (*Id.* at 15.) In fact, Budet's harm—as then alleged—was "inextricably tied to RBS's rankings," which remained high and essentially consistent through the years, despite the allegedly false reporting, according to the complaint. (Castner Op. at 14 (citing ECF No. 13 ¶¶ 4, 101).) Budet's allegations therefore "sound[ed] of deception without an injury or with an injury that has not yet occurred." (Castner Op. at 14.) "As long as [Budet] ties his injuries solely to RBS's rankings, and those rankings remain unchanged, [Budet] cannot allege that he suffered a concrete and particularized injury." (*Id.* at 15.)

As such, the Court dismissed the complaint without prejudice. Budet timely amended, filing his third Complaint in this action, and Rutgers filed the subject motion.

## II.   LEGAL STANDARD

Under Rule 12(b)(1), a court must grant a motion to dismiss if it lacks subject matter jurisdiction to hear a claim. *See* Fed. R. Civ. P. 12(b)(1). A motion to dismiss for want of standing is properly brought under Rule 12(b)(1), because "standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). On a motion to dismiss for lack of standing, plaintiff "bears the burden of establishing the elements of standing, and each element must be

4

supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Id.* (citations and internal quotation marks omitted); *see also Transunion LLC v. Ramirez*, 141 S. Ct. 2190, 2207-08 (2021) (confirming that "plaintiffs must demonstrate standing for each claim that they press and for each form of relief they seek . . . with the manner and degree of evidence required at the successive stages of the litigation").

In evaluating a Rule 12(b)(1) motion to dismiss, courts must first determine whether the motion "presents a 'facial' attack or a 'factual' attack on the claim at issue, because that distinction determines how the pleading must be reviewed." *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014) (quoting *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012)). "A facial 12(b)(1) challenge, which attacks the complaint on its face without contesting its alleged facts, is like a 12(b)(6) motion in requiring the court to consider the allegations of the complaint as true." *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016) (citation omitted). A factual challenge, on the other hand, "attacks allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts." *Id.* The party invoking the federal court's jurisdiction has "the burden of proof that jurisdiction does in fact exist." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). The Court construes Rutgers's motion as a facial attack. Therefore, the Court need only consider the complaint's allegations and the documents it attaches or references. *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000). The Court considers those items in the light most favorable to Plaintiff. *Aichele*, 757 F.3d at 358.

### III.   DISCUSSION

#### A. STANDING

"Standing is a question of subject matter jurisdiction." *Petroleos Mexicanos Refinancion v. M/T KING, A (Ex–Tbilisi)*, 377 F.3d 329, 224 (3d Cir. 2004). Federal courts are courts of limited, not general jurisdiction. *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541–42 (1986). A district court must have subject matter jurisdiction through "power authorized by Constitution and statute." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). "Article III [of the United States Constitution] confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). "Absent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims." *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006).

A district court must presume that it lacks jurisdiction over a matter unless jurisdiction is shown to be proper. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "Standing is the threshold question in every case and determines the power of the [C]ourt to entertain the suit," and as such, the Court must determine whether a plaintiff has standing prior to reaching the merits of any claims in a complaint. *Bittner v. Waterford Twp. Sch. Dist.*, No. 18-12084, 2020 WL 10223599, at *2 (D.N.J. Jan. 13, 2020) (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).[4] It is axiomatic and foundational that the issue of standing must be sufficiently demonstrated and applies in this action to all three stated claims. *See Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 359 (3d Cir. 2015) ("Standing requires that the party seeking to invoke federal jurisdiction 'demonstrate standing for each claim he seeks to press.'" (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006))); *UPS Worldwide Forwarding, Inc. v.*

---

[4] In a purported class action, a named plaintiff must satisfy the standing requirements. *See Neale*, 794 F.3d at 361.

*U.S. Postal Serv.*, 66 F.3d 621, 625 (3d Cir. 1995) (explaining that the standing requirements "must be satisfied before a litigant may seek redress in the federal courts").

To establish Article III standing, a plaintiff must demonstrate "(1) an injury-in-fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Finkelman v. Nat'l Football League*, 810 F.3d 187, 193 (3d Cir. 2016). An injury in fact, the first element of standing, is "an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Reilly v. Ceridian Corp.*, 664 F.3d 38, 41 (3d Cir. 2011) (quoting *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 290–91 (3d Cir. 2005)). A concrete injury is one that is "real, or distinct and palpable, as opposed to merely abstract." *Finkelman*, 810 F.3d at 193; *see TransUnion*, 141 S. Ct. at 2204 (noting concrete harms include "tangible harms" such as "physical and or monetary harm to the plaintiff" and "intangible harms" including "reputational harms, disclosure of private information, and intrusion upon seclusion"). An injury is particularized when it "affect[s] the plaintiff in a personal and individual way." *In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*, No. 19-MD-2904, 2021 WL 5937742, at *6 (D.N.J. Dec. 16, 2021) (quoting *Lujan*, 504 U.S. at 561 n.1); *see also In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 640 n.22 (3d Cir. 2017) (noting that the "particularization requirement" of standing requires more than a plaintiff pleading "generalized grievances"). Second, "[a]llegations of possible future injury are not sufficient to satisfy Article III." *Reilly*, 664 F.3d at 42 (citations and internal quotation marks omitted); *see id.* (noting that a "plaintiff lacks standing if his 'injury' stems from an indefinite risk of future harms inflicted by unknown third parties").

7

A plaintiff may demonstrate injury under Article III, as well as under the NJCFA, under a benefit of the bargain theory. *See In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 283 (3d Cir. 2018) ("Under the benefit of the bargain theory, a plaintiff might successfully plead an economic injury by alleging that she bargained for a product worth a given value but received a product worth less than that value."); *see also Robey v. SPARC Grp. LLC*, 311 A.3d 463, 467 (N.J. 2024) (A NJCFA claimant "can establish an ascertainable loss by demonstrating either an out-of-pocket loss or a deprivation of the benefit of one's bargain." (citing *Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783, 792 (N.J. 2005))). The benefit-of-the-bargain theory applies when a consumer claims that "a difference in value between an item as advertised and the item as delivered" exists, "but the item is not worthless." *Robey*, 311 A.3d at 472 (citing *Mladenov v. Wegmans Food Markets, Inc.*, 124 F. Supp. 3d 360, 375 (D.N.J. 2015)). "[B]enefit-of-the-bargain principles allow 'recovery for the difference between the price paid and the value of the property had the representations been true.'" *Robey*, 311 A.3d at 467 (quoting *Finderne Mgmt. Co. v. Barrett*, 955 A.2d 940, 957 (N.J. Super. Ct. App. Div. 2008)); *see Harnish v. Widener Univ. Sch. of L.*, 833 F.3d 298, 308 (3d Cir. 2016) (noting that the "benefit-of-the-bargain" is "sometimes also referred to as the 'replacement cost,' 'replacement value,' or the 'diminution' or 'loss in value' from the purchaser's 'expectation interest'" (citing *Lee v. Carter-Reed Co.*, 4 A.3d 561, 576 (N.J. 2010); *Thiedemann*, 872 A.2d at 789, 792; *Furst v. Einstein Moomjy, Inc.*, 860 A.2d 435, 440-42 (N.J. 2004))).

Little has changed notwithstanding Budet's multiple complaints. Here, most recently, Budet expanded the proposed class to include all students enrolled in RBS's full-time and part-time MBA programs, MBA certificate programs, and other master's degrees between January 1, 2018, and the present. (SAC ¶ 136.) To support that expansion, he shows that Rutgers included the

ranking of its full-time MBA program in promotional materials for its part-time MBA program, demonstrating how Rutgers used the prestige of its full-time program to attract students to other programs. (*See* SAC ¶¶ 38-42, Exs. A-L.) Budet alleges that "Plaintiff and the Class members chose to attend Rutgers based on these affirmative misrepresentations having *the potential to mislead or deceive* . . . ." (SAC ¶ 37 (emphasis added).) Budet also claims Rutgers's part-time students "*may have been charged more* in tuition than full-time students," given that the part-time program takes longer to complete. (SAC ¶ 45 (emphasis added).)

But Budet still ties his harm inextricably to RBS's rankings: "But for [RBS]'s tainted rankings, . . . [Budet] would have selected a different program. If [RBS] had not received these artificially high rankings that it promoted to both full and part-time masters students, . . . [Budet] would have not agreed to pay [Rugters's] premium tuition." (SAC ¶ 7.) His "ascertainable loss for damages" is still the "incremental difference" between what he paid Rutgers and what he "would have paid had [he] enrolled in other unranked or lower ranked programs." (SAC ¶ 172.) And his theory of loss is still that he "received an education less than and different from what" he expected. (SAC ¶ 171.)

Budet's own SAC acknowledges the speculative nature of the alleged injury. As the SAC alleges, Rutgers's supposed misrepresentations had "the potential to mislead" and students "may have been charged more." (SAC ¶¶ 37, 45 (emphasis added).) The very language of the SAC bespeaks speculative injuries that fail to allege a "concrete" or "particularized" and "actual" or "imminent" harm to Plaintiffs. *See Reilly*, 664 F.3d at 41. Moreover, as Judge Castner held: "As long as Plaintiff ties his injuries solely to RBS's rankings, and those rankings remain unchanged, Plaintiff cannot allege that he suffered a concrete and particularized injury." (Castner Op. at 15.) Plaintiff's third Complaint again fails to allege any facts demonstrating a change in the rankings.

9

The key difference from the previous complaint is that Budet now amplifies his benefit-of-the-bargain theory of losses. Budet alleges that the tainted rankings impacted students' "valuation of the bargain," "assessment of a Rutgers education's worth," and "assessment of the future yield of their degrees," thus "causing many more students to enroll at Rutgers." (SAC ¶¶ 1, 139.) He draws these allegations from *United States v. Porat*, where the United States Court of Appeals for the Third Circuit implied that falsely inflated school rankings could support a benefit-of-the-bargain theory of damages. 76 F.4th 213 (3d Cir. 2023). This Court does not find *Porat* apposite to Budet's contentions.

In *Porat*, the Third Circuit affirmed wire-fraud convictions of the former dean of Temple University's business school for his scheme to raise the rankings of the school's online and part-time MBA programs. 76 F.4th 213, 215-16 (3d Cir. 2023). When the scheme was exposed, U.S. News & World Report moved the online MBA program to the "Unranked" category; the business school withdrew its other programs from U.S. News's consideration; and the online and part-time MBA programs, when they were ranked again, both fell to 41st place from highs of first place and seventh place, respectively. *Porat*, 76 F.4th at 216-17. At trial, a former student testified that the business school's "highly ranked brand" drew him to the school, and the school's Number One ranking "was the only factor in [his] decision making" in choosing Temple over another school. *Porat*, 76 F.4th at 216-17. As to the element that victims were deprived money, the Third Circuit found that "evidence indicated that [the business school]'s falsely inflated rankings impacted students' valuation of the bargain," such that "a rational jury could find beyond a reasonable doubt that the students did not receive the full benefit of their bargain," and that "Porat's false ranking representations affected their 'economic calculus.'" *Porat*, 76 F.4th at 221.

10

*Porat* illustrates what Budet's action is missing: a demonstrable diminution in the true value of Budet's education or degree—an ascertainable loss. In *Porat*, the school's rankings plummeted, reflecting the materiality of the false reporting. *Id.* at 220. The Third Circuit held that the "falsely inflated rankings impacted students' valuation of the bargain, impacting their assessment of a [Temple's] education's worth and their assessment of the future yield of a [Temple] MBA, and caus[ed] many more students to enroll . . . ." *Id.* at 221. at Fox. As to that materiality, the Third Circuit rejected Porat's reliance on cases that were distinguishable in two ways. First, Porat's cases did not involve "the same type of bargain" as that of Temple and its students—"the future value of the bargained-for items" (in *Porat*, the future value of MBA degrees). *Porat*, 76 F.4th at 221 n.6. Second, the cases did not involve "false representations . . . of the kind that could materially affect present and future value" (in *Porat*, false reporting whose secrecy caused rankings to soar and whose exposure caused rankings to plummet). *Id.*

Here, as far as Budet alleges, RBS's rankings have not changed, much less plummeted, from what Budet bargained for. Nor does Budet allege that the "tainted rankings" materially affected the present or future value of his degree. All that has changed since learning of Rutgers's reporting, according to the complaint, is Budet's subjective value of his degree. Such subjective assertions, accepted as true, are insufficient. *See Finkelman*, 810 F.3d at 193 (explaining that "[t]o be 'concrete,' an injury must be 'real, or distinct and palpable, as opposed to merely abstract,'" and "[t]o be sufficiently 'particularized,' an injury must 'affect the plaintiff in a personal and individual way'" (internal citations omitted)); *see also Robey*, 311 A.3d at 475 (finding that plaintiffs' subjective allegations of their purchases' value, "assumed to be true, do not establish a cognizable ascertainable loss under a benefit-of-the-bargain theory"). Budet's complaint lacks such specific allegations of an ascertainable loss.

11

This Court's finding squares with those of other courts that addressed similar inflated-tuition claims. Budet, for example, relies on *Harnish v. Widener University School of Law*,[5] to support his argument that this action should at least proceed to discovery. (ECF No. 26 at 28-30.) The *Harnish* plaintiffs were graduates of Widener Law School, asserting class-action consumer-fraud claims arising from "Widener's marketing materials and reporting practices" for employment statistics. 931 F. Supp. 2d at 644-45. The plaintiffs, like Budet, sought to recover the difference between "the inflated tuition" they paid based on Widener's material representations about job placement and "the true value of a [Widener] degree." *Id.* at 652-53. The plaintiffs asserted, as Budet does, that they "would not have paid the amount in tuition" had they "been aware of [Widener]'s true job placement rate and salary statistics." *Id.* at 653. However, those plaintiffs, unlike Budet, demonstrated that their law degrees "did not result in satisfactory legal employment." *Id.* at 644. One plaintiff was still unemployed; another plaintiff worked in a non-legal position and "could not find a permanent position in the legal industry"; another, with some difficulty, found full-time legal employment, though her salary was too low to cover her debt. *Id.* at 644. With that, the district court found that the plaintiffs' claimed benefit-of-the-bargain theory of losses could survive a motion to dismiss. *Id.* at 653.[6]

Budet also argues that other courts have accepted students' benefit-of-the-bargain claims that "they received different, lesser value education than expected." (ECF No. 26 at 21-22.) In support, Budet cites several decisions that permitted students to pursue tuition refunds from

---

[5] 931 F. Supp. 2d 641 (D.N.J. 2013).

[6] It is noteworthy, but not dispositive, that in later denying class certification, the Third Circuit was "confident" that the district court properly scrutinized, and ultimately rejected, the plaintiffs' "ability to demonstrate the fact of damage—'ascertainable loss' and a 'causal relationship'—class-wide." *Harnish*, 833 F.3d at 306. More relevant, the Third Circuit concluded that "the plaintiffs' chosen inflated-tuition theory" of class-wide damages for their claim that Widener's misrepresentation of employment statistics "caused them to pay more for their education than it was truly worth" was "a non-cognizable theory." *Harnish*, 833 F.3d at 308-09.

12

universities that moved to online classes during the COVID-19 pandemic. *See Dougherty v. Drew University*, 534 F. Supp. 3d 363, 370-73 (D.N.J. 2021) (finding that a student had standing "because she suffered an injury by receiving a different, allegedly lesser education than expected," and her parent had standing because "she paid tuition to the University and seeks what amounts to a refund"); *Ninivaggi v. University of Delaware*, Civ. No. 20-1478, 2023 WL 2734343, at *1-2 (D. Del. Mar. 31, 2023) (Bibas, J., sitting by designation) (finding that students seeking a refund of tuition had standing because their classes were moved to online, which the court could redress by awarding damages or ordering restitution);[7] *Fittipaldi v. Monmouth Univ.*, No. 20-05526, 2021 WL 2210740, at *9-10 (D.N.J. June 1, 2021) (permitting students seeking a refund of tuition to sue for breach of contract under a quasi-contract theory); *Martin v. Lindenwood Univ.*, No. 20-1128, 2021 WL 3077665, at *1-2 (E.D. Mo. July 21, 2021) (permitting students to sue for the price difference between online courses and in-person courses); *Wright v. S. New Hampshire Univ.*, 561 F. Supp. 3d 211, 213-14 (D.N.H. 2021) (approving a class action settlement for students who paid tuition for in-person classes).

These COVID-19 cases are inapposite. In those cases, the plaintiffs suffered harm beyond the type of subjective stigma from which Budet allegedly suffers knowing that the integrity of his school's still-high ranking might be compromised. The deprivation of the benefit that the COVID-19 plaintiffs bargained and paid for—in-person classes—was more than theoretical, hypothetical, or illusory, as injuries must be for standing purposes. Budet, in contrast, does not allege that he suffered a concrete injury traceable to Rutgers's reporting. Without showing how he was injured,

---

[7] *See also Ninivaggi v. Univ. of Delaware*, 555 F. Supp. 3d 44, 48 (D. Del. 2021) (finding that parents who paid tuition had standing to sue over the university's move to online classes during the pandemic, because the university "promised to use the money for one purpose but did not," which was a "'financial harm [that] is a classic and paradigmatic form of injury' that supports standing" (quoting *Cottrell v. Alcon Lab'ys*, 874 F.3d 154, 163 (3d Cir. 2017) and cleaned up)).

Budet cannot establish an ascertainable loss, even where the benefit that catalyzed his bargain with Rutgers was tainted. *See Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 254 (3d Cir. 2005) (noting that an injury in fact must be "concrete" rather than "conjectural or hypothetical" (citations omitted); *see also Finkelman*, 810 F.3d at 201 (explaining that "there is a difference between allegations that stand on well-pleaded facts and allegations that stand on nothing more than supposition" and "even at the pleading stage, we need not accept as true unsupported conclusions and unwarranted inferences" (citations and internal quotation marks omitted)).

Rutgers cites a series of "DeVry cases" that illustrate what a measurable loss might look like. In those cases, students asserted consumer-fraud claims against DeVry University for advertising inaccurate employment statistics.[8] For a while, courts rejected damages theories like Budet's as too speculative to state a claim. *See Robinson*, 2018 WL 828050, at *4 ("In short, plaintiffs' allegation that they would not have purchased an education from DeVry but for the misrepresentations contains an implicit and too speculative notion of educational value based on employment prospects."); *Petrizzo*, 2018 WL 827995, at *6 ("A consumer-fraud complaint need not allege a precise damages amount or a fully-developed mathematical model for calculating damages. But it needs to allege facts sufficient to show that plaintiffs suffered actual, measurable, non-speculative damages.").

Then, as one court later observed, "[t]he tide that was seemingly in DeVry's favor shifted . . . when motions to dismiss three similar suits in other parts of the country were denied." *McCormick*, 2022 IL App (1st) 201197-U, ¶ 5. The shift came when DeVry decreased tuition by

---

[8] *See Robinson v. DeVry Educ. Grp., Inc.*, No. 16-7447, 2018 WL 828050 (N.D. Ill. Feb. 12, 2018); *Petrizzo v. DeVry Educ. Grp. Inc.*, 2018 WL 827995 (N.D. Ill. Feb. 12, 2018); *Polly v. Adtalem Glob. Educ., Inc.*, No. 16-9754, 2019 WL 587409 (N.D. Ill. Feb. 13, 2019); *Brown v. Adtalem Glob. Educ., Inc.*, 421 F. Supp. 3d 825 (W.D. Mo. 2019); *Robinson v. Adtalem Glob. Educ., Inc.*, 2019 U.S. Dist. LEXIS 242263 (N.D. Ga. Nov. 25, 2019); *McCormick v. Adtalem Glob. Educ., Inc.*, 2022 IL App (1st) 201197-U, ¶ 5.

14

20% after federal and state actions led to its enjoinment from making certain representations about post-graduate employment statistics—making the students' losses measurable. *See Polly*, 2019 WL 587409, at *3 ("It is reasonable to infer from the tuition decrease that DeVry's allegedly inflated employment-rate representations caused tuition price to be higher than it otherwise would have been, meaning it is plausible that plaintiffs suffered actual damage in some amount."); *Brown*, 421 F. Supp. 3d at 830-83 (W.D. Mo. 2019) (following *Polly*); *Robinson*, 2019 U.S. Dist. LEXIS 242263, at *10-13 ("The Complaint before this Court, however, differs in one important respect from the complaint that was dismissed in *Robinson I*. The Plaintiff now alleges that the Defendants reduced their tuition by 20% after being enjoined from making the 90% Placement Claim.").

Unlike those cases, Budet's claimed losses are not measurable or quantifiable, but illusory and conjectural. As Judge Castner previously stated: "As long as [Budet] ties his injuries solely to RBS's rankings, and those rankings remain unchanged," or no other demonstrable loss exists, "[Budet] cannot allege that he suffered a concrete and particularized injury." (Castner Op. at 15.) As such, the Court finds Budet lacks Article III standing, and therefore the Court dismisses the Complaint for a lack of subject matter jurisdiction. *See Pazymino v. Portfolio Recovery Assocs., LLC*, No. 19-12259, 2023 WL 7126446, at *2 (D.N.J. Oct. 30, 2023) ("Absent standing, there is no case or controversy, and a federal court must dismiss the claims." (citing *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006))).

### B. DISMISSAL WITH PREJUDICE

The court need not dismiss without prejudice and with leave to amend if amendment would be "inequitable or futile." *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 110 (3d Cir. 2002) (citations omitted); *Henry v. City of Allentown*, No. 12-1380, 2013 WL 6409307, at *2 (E.D. Pa. Dec. 9, 2013) ("[A] District Court may exercise its discretion and refuse leave to amend if such

amendment would be futile, particularly when a plaintiff has had multiple opportunities to improve the pleadings."); *Mesadieu v. City of Linden*, No. 18-14561, 2019 WL 2514715, at *5 (D.N.J. June 18, 2019), *aff'd*, 791 F. App'x 294 (3d Cir. 2020) (dismissing with prejudice and finding any "further amendment would be futile" where the Court previously "set forth the deficiencies with Plaintiff's claims and Plaintiff failed to cure any of those deficiencies in the FAC."); *Callaway v. New Jersey State Police Troop A*, No. 12-5477, 2015 WL 1202533, at *7 (D.N.J. Mar. 17, 2015) (dismissing claims with prejudice where "the underlying circumstances from [the relevant factual period] have not substantially changed" and Plaintiff had previous opportunities to plead his claims); *Prince v. Trumark Fin. Credit Union*, No. 22-3097, 2022 WL 10584444, at *5 (E.D. Pa. Oct. 18, 2022), *appeal dismissed*, No. 22-3173, 2023 WL 3529406 (3d Cir. Mar. 2, 2023) (dismissing "claim with prejudice as [Plaintiff] has now twice failed to plead" his claims).

In the case at bar, Budet has filed three complaints and has been given repeated opportunities to cure his pleading deficiencies. Judge Castner, in her prior Opinion, chronicled in painstaking detail the clear deficiencies in Budet's purported class action complaint. As detailed above, the Court again finds that Budet fails to allege an injury in fact. Generally, while dismissal with leave to re-file would be an appropriate result, here, Budet has already been availed of this opportunity twice. Thus, allowing Budet to file a third amended complaint would only serve to needlessly extend this litigation, and subject Rutgers to additional cost in added time, attention and financial expense. *See Columbus LTACH Mgmt., LLC v. Quantum LTACH Holdings, LLC*, No. 16-6510, 2019 WL 2281632, at *4 (D.N.J. May 29, 2019) (dismissing with prejudice because plaintiff had repeatedly failed to correct the same deficiency in his pleading); *see also Catanese Bros. Inc. v. W. Deer Twp.*, No. 07-663, 2008 WL 2020121, at *4 (W.D. Pa. May 8, 2008) (dismissing complaint where "amendment would be futile and that it would be inequitable to

require Defendant to incur further expense"). As such, the Court finds that any amendment would be futile. Accordingly, the Court will dismiss the SAC with prejudice.

IV.  **CONCLUSION**

For the reasons set forth above, Rutgers's Motion to Dismiss under Rule 12(b)(1) is **GRANTED**. Plaintiff's Second Amended Complaint is **DISMISSED** with prejudice. An appropriate Order follows.

Dated: July 10, 2024

ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE